IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


BASSIM ALKHAFAJY            )
                           )
v.                         )        NO. 3:08-0144
                           )
MICHAEL J. ASTRUE,         )
Commissioner of Social Security )



To: The Honorable John T. Nixon, Senior District Judge


## REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), as provided by the Social Security Act ("the Act").

Upon review of the Administrative Record as a whole, the Court finds that the Commissioner's determination that the plaintiff could perform work at the light level of exertion (tr. 25) during the relevant time period is supported by substantial evidence in the record as required by 42 U.S.C. § 405(g), and that the plaintiff's motion for judgment on the record (Docket Entry No. 11) should be denied.

1

# I. INTRODUCTION

The plaintiff filed applications for DIB and SSI on June 28, 2002, alleging a disability onset date of October 29, 2001, due to seizures, weakness in his feet, difficulty breathing, and diabetes. (Tr. 123.) The plaintiff's application was denied initially (tr. 41) and on November 28, 2002, he requested reconsideration, alleging additional impairments of high blood pressure, impaired vision, shortness of breath, leg pain, and kidney stones. (Tr. 70, 137-40.) His application, as amended, was denied upon reconsideration. (Tr. 43-45.) A hearing before Administrative Law Judge ("ALJ") Linda Gail Roberts was held on March 11, 2005. (Tr. 532A-54.) The ALJ delivered an unfavorable decision on May 25, 2005. (Tr. 49-60.)

The Appeals Council remanded the case to the ALJ on April 13, 2006. (Tr. 61-65.) The Appeals Council found that the ALJ had given controlling weight to the opinion of the plaintiff's treating physician, who had restricted the plaintiff to sedentary work, and if the plaintiff were so restricted, he would be considered disabled in light of his age, education, and inability to communicate in English. (Tr. 63-64.) However, the Appeals Council noted that the ALJ had found that the plaintiff had nonexertional limitations consistent with the assessment of a consultative examiner. *Id.* Therefore, the Appeals Council remanded the case back to the ALJ to further consider the plaintiff's residual functional capacity ("RFC") and provide rationale in support of her assessment and, if necessary, to obtain further evidence from a vocational expert. *Id.* After his initial claims were denied, the plaintiff filed subsequent claims for DIB and SSI on July 15, 2005,[1] which

---

[1] It does not appear that the plaintiff's July 15, 2005, claims are in the record. Since the Appeals Council referred to those claims as "duplicative" of his initial claims, the Court assumes that he asserted the same disabling conditions as he had in his initial application.

2

were initially denied on October 16, 2005. (Tr. 64.) The Appeals Council directed the ALJ to "associate the claim files" and issue a new decision on those claims as well. *Id.*

The ALJ held a second hearing on August 17, 2006. (Tr. 555-86.) The ALJ delivered a second unfavorable decision on February 2, 2007 (Tr. 17-26), and the plaintiff sought review by the Appeals Council. (Tr. 11, 13.) On December 12, 2007, the Appeals Council denied the plaintiff's request for review (tr. 5-7), and the ALJ's February 2, 2007, decision became the final decision of the Commissioner.

## II. BACKGROUND

The plaintiff was born on July 1, 1960, and was 41 years old as of October 29, 2001, his alleged onset date. (Tr. 108.) He attended school in his native country, Iraq, through part of sixth grade, and his past jobs included employment as a dishwasher and janitor/hospital housekeeper. (Tr. 124, 536-39, 571-72.)

### A. Chronological Background: Procedural Developments and Medical Records[2]

The plaintiff has a history of kidney stones (nephrolithiasis) and diabetes mellitus. (Tr. 157-58, 212-13, 235, 262, 299, 304, 342, 405, 409.) On December 1, 1999, the plaintiff presented to Southern Hills Medical Center ("SHMC") with complaints of right flank pain, fever, and dysuria.[3] (Tr. 408.) Dr. Fawwaz A. Alkayyali diagnosed the plaintiff with severe renal urethral colic and

---

[2] Every attempt to decipher the medical evidence of record was undertaken; however, some handwritten notations or poor copies made some of the records illegible.

[3] Dysuria refers to painful urination or "any difficulty with urination." Dorland's Illustrated Medical Dictionary 581 (30th ed. 2003) ("Dorland's").

3

admitted him to the hospital. (Tr. 408-10.) A December 2, 1999, x-ray of his chest was normal. (Tr. 405.) On December 6, 1999, the plaintiff underwent a Pulmonary Function Analysis ("PFA") and gave a forced expiratory volume in one second ("$FEV_1$") of 1.07.[4] (Tr. 407.) The PFA also indicated that the plaintiff smokes cigarettes. *Id.*

In a letter dated January 11, 2000, Dr. Alkayyali wrote that the plaintiff was temporarily unemployed due to urolithiasis,[5] diabetes, and Chronic Obstructive Pulmonary Disease ("COPD"). (Tr. 271.) On April 26, 2000, the plaintiff was admitted to Metropolitan Nashville General Hospital ("MNGH") with complaints of dizziness and chest and back pain and was diagnosed with "[c]ommunity acquired pneumonia," "poorly controlled diabetes mellitus due to medical non compliance," "[e]levated cardiac enzymes," and nephrolithiasis. (Tr. 262-64.) A chest x-ray taken on April 29, 2000, revealed "cardiomegaly with increased pulmonary congestion" and "increased right perihilar density." (Tr. 162.) On May 1, 2000, he underwent a myocardial stress test, the results of which were normal, and he was prescribed Aminophylline.[6] (Tr. 160-61.) Upon discharge from the hospital on May 2, 2000, the plaintiff was diagnosed with diabetes mellitus and nephrolithiasis. (Tr. 262.)

On October 10, 2001, the plaintiff underwent a series of exams: a chest x-ray showed "no evidence of active heart or lung disease" (tr. 380), a CT scan of his head was normal (tr. 383, 403),

_____

[4] $FEV_1$ is the measurement of the amount of air an individual is able to exhale in the first second of a PFA. Johns Hopkins Medicine, "Pulmonary Function Laboratory," at http://www.hopkinsmedicine.org/pftlab/pftests.html.

[5] Urolithiasis is "the diseased condition associated with the presence of urinary calculi." Dorland's at 1993.

[6] Aminophylline is a muscle relaxant prescribed for its bronchodilator effect in diseases like asthma, bronchitis, and emphysema. Dorland's at 62.

4

an echocardiogram revealed "trivial mitral regurgitation, mild concentric left ventricular hypertrophy, and mild tricuspid regurgitation" (tr. 381-82), and an electroencephalogram ("EEG") showed "no evidence of any epileptiform activity or suspicious seizure activity." (Tr. 379.) On October 13, 2001, a CT scan of his head was normal and a chest x-ray revealed old granulomatous disease[7] but was otherwise normal. (Tr. 388-89.) On the same day, the plaintiff presented to the emergency room at SHMC, where Dr. Linda C. Plummer diagnosed him with a seizure disorder and diabetes mellitus. (Tr. 391.) She noted that the plaintiff had not been taking his Glucophage[8] as directed, and encouraged him to take Dilantin[9] and Glucophage at home. (Tr. 390-91.) On October 14, 2001, the plaintiff filled a prescription for Phenytoin Sodium.[10] (Tr. 152.)

On November 2, 2001, Dr. Alkayyali wrote a letter that the plaintiff was unable to work "for the time being" due to an uncontrolled seizure disorder and diabetes mellitus. (Tr. 120.) On December 19, 2001, the plaintiff presented to Dr. Alkayyali with complaints of seizures and leg and back pain, and he diagnosed the plaintiff with a seizure disorder and noted that his Dilantin levels were low. (Tr. 266.) The plaintiff filled prescriptions for Phenytoin Sodium in December of 2001, and for Glucophage in both December of 2001 and January of 2002. (Tr. 149-50.) On January 13, 2002, the plaintiff presented to the emergency room at SHMC and was admitted to the hospital after

---

[7] According to MedicineNet.com, old granulomatous disease is synonymous with calcified granuloma, "one of a number of forms of localized nodular inflammation found in tissues." MedicineNet.com, "Definition of calcified granuloma" at http://www.medterms.com/script/ main/ art.asp?articlekey=8908.

[8] Glucophage is an antidiabetic medication. Saunders Pharmaceutical Word Book. 322-23 (2009) ("Saunders").

[9] Dilantin is an anticonvulsant. Saunders at 227.

[10] Phenytoin Sodium is used for the treatment of seizures. Physicians Desk Reference 2380 (64th ed. 2010) ("PDR").

Case 3:08-cv-00144   Document 17   Filed 09/21/10   Page 5 of 26 PageID #: 55

complaining of having had four seizures that day.[11] (Tr. 361-62.) Dr. Alkayyali diagnosed him with bronchitis, COPD exacerbation, subtherapeutic Dilantin levels, and multiple seizures, and he was admitted to the hospital. (Tr. 361-62, 398.) An x-ray of the plaintiff's chest showed no evidence of active heart or lung disease (tr. 363, 399), and he was prescribed Glucophage, Dilantin, and Combivent.[12] (Tr. 362, 367.)

In February of 2002, the plaintiff filled a prescription for Metformin,[13] (tr. 150) and in July of 2002, he filled prescriptions for Metformin, Vioxx,[14] Gemfibrozil,[15] Augmentin,[16] and Hydrocodone.[17] (Tr. 151-52.) On July 1, 2002, the plaintiff returned to Dr. Alkayyali and he diagnosed him with lower back pain and prescribed Skelaxin[18] and Vioxx. (Tr. 440.)

On August 15, 2002, Dr. Bruce A. Davis conducted a consultative exam of the plaintiff. (Tr. 278-80.) He noted that the plaintiff had a three-year history of diabetes treated with oral medications, a ten-year history of seizure disorder treated the last two years with Dilantin, a three

---

[11] The Court is confused as to when the plaintiff was admitted to the hospital, i.e., if it was on January 13, 2002, January 14, 2002, or January 15, 2002, since none of the medical reports from those dates provide an admission date. (Tr. 361-63, 398-99.) Additionally, the record does not indicate when the plaintiff was discharged from the hospital. *Id.*

[12] Combivent is a bronchodilator that is prescribed for COPD. Saunders at 178.

[13] Metformin is a medication prescribed to improve glycemic control in persons with diabetes mellitus. PDR at 1346.

[14] Vioxx was withdrawn from the market in 2004, but was a nonsteroidal anti-inflammatory drug used to treat various forms of arthritis. Saunders at 756.

[15] Gemfibrozil reduces cholesterol and triglycerides in the blood. Saunders at 315.

[16] Augmentin is an antibiotic used to treat or prevent bacterial infections. PDR at 1335.

[17] Hydrocodone, also known as Vicodin, is a pain reliever. PDR at 560.

[18] Skelaxin is a skeletal muscle relaxant. Saunders at 646.

year history of lung problems treated with an inhaler bronchodilator, cardiac problems treated with

Lopid,[19] recent kidney stones and continuing abdominal pain treated with Septra,[20] Demerol,[21] and

Lortab,[22] pain in his lower right leg, anxiety, and depression. (Tr. 278-79.)  Dr. Davis diagnosed the

plaintiff with class 1 obesity, type 2 diabetes mellitus, grand mal seizure disorder, and a cigarette-

associated obstructive lung disease. (Tr. 280.)  He noted that the plaintiff had smoked less than half

a pack per day until quitting one year prior to the examination (tr. 279), and that during a

Spirometric test taken during this examination, the plaintiff had a $FEV_1$ of 1.65. (Tr. 19, 281.)  Dr.

Davis opined that the plaintiff could occasionally lift/carry twenty pounds and frequently lift/carry

ten pounds, could stand/walk for up to six hours and sit for eight hours in an eight-hour workday,

and was limited in his ability to squat and to climb. (Tr. 280.)  He noted that the plaintiff should

avoid exposure to irritating inhalants and take precautions for his seizures. *Id.*

In August and September of 2002, a CT scan of the plaintiff's head and x-rays of his chest

and abdomen did not reveal any significant findings. (Tr. 327, 334, 343-45.)  On October 4, 2002,

Tennessee Disability Determination Section ("DDS") non-examining physician Dr. Lawrence G.

Schull completed a physical RFC assessment on the plaintiff (tr. 307-14) and opined that he could

occasionally lift/carry up to fifty pounds and frequently lift/carry up to twenty-five pounds.

(Tr. 308.)  He noted that the plaintiff could stand/walk and sit for approximately six hours in an eight

hour workday and had unlimited ability in his upper extremities to push/pull. *Id.*

---

[19] Lopid is used to treat high blood cholesterol and triglycerides. Saunders at 414.

[20] Septra is an antibiotic that kills sensitive bacteria. Saunders at 638.

[21] Demerol is a pain reliever similar to morphine. Saunders at 208.

[22] Lortab is a pain reliever with the generic name of hydrocodone. Saunders at 415.

7

On December 11, 2002, Dr. Alkayyali wrote in a letter that the plaintiff was unable to work due to his seizure disorder, diabetes, and hypertension. (Tr. 425, 443.) The next day, the plaintiff was taken to the emergency room at SHMC, where he was diagnosed with a "[b]reakthrough seizure with subtherapeutic Dilantin level." (Tr. 318, 321.) On April 23, 2003, the plaintiff had an eye examination and Dr. Walter W. Frey opined that he was mildly myopic but was able to move around the office "rapidly without any apparent disability." (Tr. 411.)

On April 29, 2003, non-examining DDS physician Dr. Denise Bell completed a physical RFC on the plaintiff (tr. 413-20) and found that he could occasionally lift/carry fifty pounds and frequently lift/carry twenty-five pounds, stand/walk or sit for about six hours in an eight-hour workday, and had unlimited ability in his upper extremities to push/pull. (Tr. 414.) Dr. Bell opined that the plaintiff could frequently climb, balance, stoop, kneel, crouch, or crawl (tr. 415), but that he should avoid exposure to hazards such as machinery and heights. (Tr. 417.)

In 2003, the plaintiff saw Dr. Alkayyali on nine occasions (tr. 445-53), and on August 6, 2003, Dr. Alkayyali completed a Medical Source Statement of Ability to Do Work-Related Activities ("Medical Source Statement") (tr. 422-24), in which he opined that due to lower back pain, the plaintiff could lift/carry a maximum of ten pounds occasionally and a maximum of five pounds frequently. (Tr. 422.) He found that in an eight hour work day, the plaintiff could stand/walk a total of one hour and for ten minutes at a time without interruption. *Id.* Dr. Alkayyali noted that the plaintiff could occasionally climb, stoop, crouch, kneel, or crawl, could frequently balance, and was limited in his ability to reach, push, and pull. (Tr. 423.) The only explanation provided by Dr. Alkayyali for the listed limitations was his notation that the plaintiff had "low back pain" that impaired his ability to lift/carry. (Tr. 422.) Although the form that Dr. Alkayyali completed solicited

the "medical findings that support[ed]" his assessment in each of the six categories, he did not include any medical findings. (Tr. 422-24.)

In March and April of 2004, the plaintiff presented to the SHMC emergency room, with complaints of right kidney pain and right abdomen and flank pain. (Tr. 427, 429.)  On neither occasion was the plaintiff diagnosed with any acute conditions nor was the etiology of his pain determined. *Id.*  The plaintiff was seen again in the SHMC emergency room on July 28, 2004, after being physically assaulted in "an altercation" and having had a five minute seizure. (Tr. 431.)  A CT scan of the plaintiff's head and x-rays of his cervical spine were normal. (Tr. 436-37.)  Nearly two weeks later, the plaintiff returned to Dr. Alkayyali with complaints of lower back and leg pain, and Dr. Alkayyali diagnosed him with lumbar radiculitis[23] and prescribed Naprosyn.[24] (Tr. 458.)  The plaintiff saw Dr. Alkayyali four times in May, July, and August of 2004. (Tr. 456-59.)  On August 23, 2004, Dr. Alkayyali wrote in a letter that the plaintiff was unable to work because of "multiple problems, including diabetes mellitus, hypertension, seizure disorder, chronic obstructive pulmonary dyspnea, hypertriglyceridemia, recurrent renal calculi, [and] depression." (Tr. 460.)  On September 27, 2004, Dr. Alkayyali examined the plaintiff and diagnosed his leg pain as diabetic neuropathy and prescribed Neurontin.[25] (Tr. 461.)  Between September 27, 2004, and February 2, 2005, Dr. Alkayyali saw the plaintiff five times for knee and leg pain. (Tr. 461-66.) On January 18, 2005, an x-ray of the plaintiff's right knee was normal. (Tr. 438, 464.)

---

[23] Radiculitis is an "inflammation of the root of a spinal nerve, especially of that portion of the root which lies between the spinal cord and the intervertebral canal." Dorland's at 1562.

[24] Naprosyn, also known as Naproxen, is used for the relief of various forms of arthritis, tendonitis, bursitis, gout, and pain management. PDR at 2851.

[25] Neurontin is an anticonvulsant prescribed for partial-onset seizures. Saunders at 488.

9

On February 22, 2005, the plaintiff was transported by ambulance to the emergency room at SHMC after having a seizure. (Tr. 475.) He was diagnosed with hyperglycemia, mild asthma exacerbation, and a "[s]eizure due to medical noncompliance." *Id.* The plaintiff's family reported that he was not taking his seizure medication because he "does not like the way they make him feel." *Id.* The plaintiff was treated with Dilantin, Tegretol,[26] Albuterol,[27] Atrovent,[28] and insulin, and prescribed Tegretol and Dilantin. *Id.*

On April 21, 2005, Dr. Alkayyali examined the plaintiff and diagnosed him with chest pain. (Tr. 495.) On May 23, 2005, a CT scan of the plaintiff's head and x-rays of his chest and ribs were normal. (Tr. 484-86.) On May 20, 2005, Dr. Alkayyali diagnosed the plaintiff with an urinary tract infection. (Tr. 476.) The plaintiff presented to Dr. Alkayyali twice in June of 2005, with complaints of knee, back, and leg pain. (Tr. 478-79, 497-98.) After the second examination, Dr. Alkayyali ordered an MRI of his knee, which revealed "[b]one bruising of the medial tibial plateau [but] [n]o evidence of cruciate ligament or meniscal tear." (Tr. 487, 498.) On July 8, 2005, the plaintiff presented to the emergency room at SHMC with left knee pain after injuring his knee while playing soccer two weeks earlier. (Tr. 478-79.) The emergency room notes indicate that the plaintiff reported that, when he kicked the soccer ball, "he missed [] and he landed on the floor." (Tr. 478.) The plaintiff was diagnosed the plaintiff with a "[l]eft knee injury/strain with cartilage injury." (Tr. 479.)

---

[26] Tegretol is an anticonvulsant used to control seizures. Saunders at 688.

[27] Albuterol is an inhaler used in treatment or prevention of bronchospasms. PDR at 3393.

[28] Atrovent is an inhaler used to treat COPD. Saunders at 70.

10

Between August of 2005, and February of 2006, the plaintiff presented to Dr. Alkayyali six times with complaints of leg, back, neck, shoulder, head, and underarm pain. (Tr. 499-504.) During that six month period, Dr. Alkayyali referred the plaintiff to an orthopedist once[29] (tr. 499) and a CT scan of the plaintiff's head was normal. (Tr. 488.)

On March 14, 2006, Dr. Alkayyali wrote in a letter that the plaintiff was unable to work due to diabetes, hypertension, seizure disorder (almost two seizures per month), hyperlipidemia,[30] chronic low back pain, chronic depression, enlarged prostate, and chronic fatigue. (Tr. 506.) He also noted that the plaintiff was taking Lantus,[31] Tegretol, Metformin, "Flosmax,"[32] Diovan,[33] Dilantin, and Actos.[34] *Id.* Dr. Alkayyali saw the plaintiff on April 17, 2006 (tr. 505), and on May 17, 2006, he completed a Medical Source Statement (tr. 510-12) and opined that the plaintiff's ability to lift/carry was affected by his low back pain. (Tr. 510.) He found that the plaintiff could occasionally lift a maximum of ten pounds, frequently lift a maximum of five pounds, and stand/walk for a total of one hour in an eight-hour work day and for ten minutes at a time without interruption. *Id.* Dr. Alkayyali also found that the plaintiff could sit a total of four hours per day and for one hour at

---

[29] The record does not reflect that the plaintiff ever saw an orthopedist.

[30] Hyperlipidemia is "a general term for elevated concentrations of any or all of the lipids in the plasma." Dorland's at 883.

[31] Lantus is a form of insulin injunction. PDR at 2996.

[32] Flomax, likely what Dr. Alkayyali intended when he prescribed "Flosmax," is used for benign prostatic hypersplasia and also for adjunctive therapy for ureteral stones. Saunders at 295.

[33] Diovan is an angiotensin II receptor blocker used for treatment of hypertension and heart failure and following myocardial infarction. PDR at 2413.

[34] Actos is an oral antidiabetic drug that decreases insulin resistance and is used to treat type 2 diabetes mellitus. PDR at 3345.

a time without interruption, frequently balance, occasionally climb, stoop, crouch, or kneel, and was limited in his ability to reach, push, and pull. *Id.* In the portion of the form that solicited medical findings that supported his assessment, Dr. Alkayyali noted "low back pain," " bulging disc," and what appears to be "spondylosis."[35] *Id.*

On April 19, 2006, an MRI of the plaintiff's thoracic spine revealed a "[s]mall left paracentral disc protrusion [at] the T9-T10 level" and "[d]egenerative changes with minimal disc bulging [at the] T11-T12 and T12-L1 levels." (Tr. 490.) Nearly one month later, the plaintiff had a CT scan of his chest that showed a nodule in the superior segment of the right lower lobe of his lung, a small soft tissue nodule in the distal trachea, and right renal atrophy. (Tr. 491.)

### B. Hearing Testimony from March 11, 2005: The Plaintiff and the Vocational Expert

The plaintiff's first hearing before the ALJ was held on March 11, 2005. (Tr. 532A-54.) The plaintiff was represented by counsel and assisted by an interpreter. The plaintiff and Rebecca Williams, a vocational expert ("VE"), testified. *Id.*

The plaintiff testified that he attended school in Iraq, did not complete the sixth grade, is not able to read, write, or speak English, and previously worked as a dishwasher and hospital housekeeper/janitor. (Tr. 536, 538-39.) He related that he stopped working because of diabetes, high blood pressure, an ulcer, shortness of breath, problems with his eyes, pain in his lower back and legs, and epilepsy. (Tr. 540, 544.) The plaintiff stated that he has seizures two to three times per week

---

[35] Dr. Alkayyali's notations are practically illegible. He may have attributed the plaintiff's bulging disc to a motor vehicle accident ("MVA") but it is not clear. (Tr. 510.)

Case 3:08-cv-00144   Document 17   Filed 09/21/10   Page 12 of 26 PageID #: 62

(tr. 543) and that he takes medications, which make him sleepy, for diabetes, high blood pressure, high cholesterol, and seizures. (Tr. 543-44.)

The VE classified the plaintiff's previous jobs as a dishwasher and a janitor/hospital housekeeper as medium and unskilled work. (Tr. 547.) The ALJ asked the VE whether the plaintiff would be able to perform his past work given Dr. Davis's consultative examination, Dr. Schull's RFC assessment, and Dr. Alkayyali's Medical Source Statement, and the VE replied that the plaintiff would not be able to perform his past relevant work given the limitations in those three assessments. (Tr. 548-50.) However, the VE testified that Dr. Davis's consultative examination indicated that the plaintiff had a light RFC and could perform work as a janitor,[36] cleaner, garment presser, and packaging and filling machine operator. (Tr. 548.) Next, the VE related that Dr. Schull's RFC assessment indicated that the plaintiff had a RFC to perform "a limited branch of medium work." (Tr. 549.) She testified that, based on that RFC, the plaintiff could perform all previously mentioned light work, and that at the medium level, the plaintiff could work as a laundry cleaning machine operator, production helper, machine operator, machine feeder, and off bearer.[37] (Tr. 549-50.) On the other hand, the VE testified that, based on Dr. Alkayyali's Medical Source Statement, the plaintiff would be precluded from all work. (Tr. 550.)

---

[36] It appears that there is a discrepancy in the testimony of the VE, who first testified that the plaintiff was precluded from his past jobs, such as working as a janitor (tr. 547), but then testified that if the ALJ assigned the plaintiff a light RFC, the plaintiff could perform work as a janitor. (Tr. 548.)

[37] An off bearer is a worker who feeds or removes materials from automatic machines or equipment. "Offbearer," Occupations.careers.org, http://occupations.careers.org/50057/offbearer.

### C. Hearing testimony August 17, 2006: The Plaintiff and Vocational Expert

The plaintiff's second hearing in this case was held on August 17, 2006, before ALJ Roberts, at which the plaintiff and Gail Ditmore, the VE, testified. (Tr. 555-86.) The plaintiff was represented by counsel and was assisted by an interpreter. *Id.*

The plaintiff testified that he is not able to work because he has asthma, epilepsy, difficulty walking and standing, diabetes, and high blood pressure. (Tr. 562.) He related that he takes medications for his diabetes, blood pressure, asthma, and leg pain, but that his medications cause drowsiness. (Tr. 563-64.) The plaintiff testified that he is able to walk only 200 to 250 meters,[38] stand for five to ten minutes, and sit continuously for one to one and a half hours. (Tr. 564-66.) The plaintiff stated that he has leg and back pain and that this pain limits him to lifting objects that weigh only one or two pounds. (Tr. 565-66.) The plaintiff also testified that he has seizures two to four times per week. (Tr. 567.)

The VE described the plaintiff's previous job as a dishwasher as medium and unskilled work with a Specific Vocational Preparation ("SVP") level of two,[39] and as a hospital housekeeper/janitor as heavy and unskilled work also with a SVP level of two. (Tr. 571-72.) The ALJ asked the VE to consider what work the plaintiff would be able to perform based on Dr. Davis's consultative examination, and the VE responded that he would have a light RFC, with postural limitations, and

---

[38] 200 to 250 meters is about 657 to 820 feet.

[39] The SVP "is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." U.S. Dep't of Labor, Dictionary of Occupational Titles 1009 (4th ed. 1991)("DOT"). It is measured on a scale from 1-9 on which the higher number assigned to a job, the greater the skill that is required to perform that job. *Id.* An SVP level of two requires "[a]nything beyond short demonstration up to and including 1 month." *Id.*

Case 3:08-cv-00144   Document 17   Filed 09/21/10   Page 14 of 26 PageID #: 64

that although he could not perform his past work, he would be able to work as an unskilled

assembler, packer, and inspector. (Tr. 573-74.)  The ALJ then asked the VE to consider what work

the plaintiff would be able to perform based on Dr. Alkayyali's August 6, 2003, Medical Source

Statement, and the VE responded that he would be able to perform "slightly less than a full range"

of sedentary work, which would preclude him from performing his past work but would allow him

to work as an inspector, production worker, packer, and assembler. (Tr.578, 580-81.)  The ALJ next

asked the VE to consider what work the plaintiff would be able to perform based on Dr. Alkayyali's

May 17, 2006, Medical Source Statement, and the VE responded that he would have a sedentary and

unskilled RFC, precluding him from performing his past work, but that he could still work as a

production worker, inspector, or packer. (Tr. 575-76.)


### III.  THE ALJ'S FINDINGS

The ALJ issued an unfavorable decision on February 2, 2007. (Tr. 17-26.)  Based on the

record, the ALJ made the following findings:

1.    The claimant met the insured status requirements of title II of the
      Social Security Act as of October 29, 2001, the alleged onset date,
      and continued to meet them through December 31, 2006, but not
      thereafter.

2.    The claimant has not engaged in any substantial gainful activity since
      October 29, 2001.

3.    The evidence establishes that the claimant has a severe combination
      of impairments that includes a seizure disorder, diabetes mellitus,
      degenerative changes of the thoracic spine, chronic obstructive
      pulmonary disease, and hypertension, but that he does not have an
      impairment or combination of impairments of the level of severity
      required by 20 CFR Part 404, Subpart P, Appendix 1.

15

4.      The evidence establishes that the claimant has not experienced any pain or other symptomatology of a disabling level of severity on an ongoing basis.

5.      The evidence establishes that the claimant retains the residual functional capacity to perform light work, with occasional lifting of up to 20 pounds and frequent lifting of up to 10 pounds, 6 hours of walking/standing during an 8-hour workday, 8 hours of sitting during an 8-hour workday, infrequent or limited squatting, no climbing and working at heights, and no exposure to excessive respiratory irritants.

6.       The claimant cannot perform his past relevant work.

7.      The claimant is a younger individual.

8.      The claimant has no more than a marginal education and limited English.

9.      The claimant has performed unskilled work during his vocationally relevant past.

10.      Section 404.1569 of Regulations No. 4 and section 416.969 of Regulations No. 16 and Rule 202.16 of Table No. 2, Appendix 2, Subpart P, Regulations No. 4 provide a framework for a finding that the claimant, considering his residual functional capacity, age, education, and work experience, is "not disabled." The vocational expert confirmed that there are over 225,000 jobs as an assembler, inspector, production worker, and packer that the claimant could be expected to perform; a significant number of jobs.

11.      The claimant has not been under a "disability," as defined in the Social Security Act, at any time since October 29, 2001, the alleged onset date of disability. 20 CFR 404.1520(g), 416.920(g).

(Tr. 25-26.)

16

# IV. DISCUSSION

## A. Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching his conclusion. 42 U.S.C. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases). The Commissioner's decision must be affirmed if it is supported by substantial evidence, "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakely v. Comm'r of Soc. Sec.,* 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.1997)); *Jones* v. *Comm'r of Soc. Sec.,* 336 F.3d 469, 477 (6th Cir. 2003); *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2008); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*).

A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to

17

support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that he is not engaged in "substantial gainful activity" at the time he seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b), 416.920(b)); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that he suffers from a "severe impairment." A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.* (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

18

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. *Id.* (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)). The plaintiff may establish that he meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent him from doing his past relevant work, he is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant. *Cruse*, 502 F.3d at 539; *Jones*, 336 F.3d at 474 ("Through step four, the [plaintiff] bears the burden of proving the existence and severity of limitations caused by [his] impairments and the fact that [he] is precluded from performing [his] past relevant work."); *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, he must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that he is unable to perform his prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in the national economy. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005); *See, e.g., Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must

19

come forward with proof of the existence of other jobs a plaintiff can perform. *Longworth*, 402 F.3d at 595. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983) (upholding the validity of the medical-vocational guidelines grid as a means for the Commissioner of carrying his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of his functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the plaintiff can perform, he is not disabled.[40] *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009); *Her*, 203 F.3d at 391. *See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

### B. The Five-Step Inquiry

In this case, the ALJ resolved the plaintiff's case at step five of the five-step process, and ultimately determined that the plaintiff was not disabled as defined by the Act. (Tr. 17.) At step one, the ALJ found that the plaintiff successfully demonstrated that he had not engaged in substantial

---

[40] This latter factor is considered regardless of whether such work exists in the immediate area in which the plaintiff lives or whether a specific job vacancy exists or whether the plaintiff would be hired if he applied. *Ragan v. Finch*, 435 F.2d 239, 241 (6th Cir. 1970).

gainful activity since October 29, 2001, the alleged onset date of disability. (Tr. 25.)  At step two, the ALJ found that the plaintiff's seizure disorder, diabetes mellitus, degenerative changes of the thoracic spine, COPD, and hypertension were severe impairments. *Id.* At step three, the ALJ found that the plaintiff does not have an impairment or combination of impairments that meets or medically equals the level of severity in the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* At step four, the ALJ determined that the plaintiff had an RFC to perform light work and was precluded from returning to his past relevant work. *Id.* At step five, the ALJ found that the plaintiff could work as an assembler, packer, production worker, or inspector. *Id.*

The effect of this decision was to preclude the plaintiff from DIB and SSI and to find him not disabled, as defined in the Social Security Act, at any time after October 29, 2001, through the date of the ALJ's decision.

### C. Plaintiff's Assertions of Error

The plaintiff contends that the ALJ erred in failing to find that the plaintiff met Listing 3.02A and in failing to conclude that the plaintiff was disabled pursuant to Rule 201.17.[41] Docket Entry No. 12, at 3-5.

### 1. The ALJ properly determined that the plaintiff did not meet Listing 3.02A.

The plaintiff argues that he meets the criteria of Listing 3.02A, 20 C.F.R. Pt. 404, Subpt. P, App. 1, for COPD and is entitled to a finding of disability at step three of the five step sequential evaluation process. Docket Entry No. 12, at 5.  Specifically, the plaintiff asserts that he satisfies

---

[41] *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2.

Case 3:08-cv-00144   Document 17   Filed 09/21/10   Page 21 of 26 PageID #: 71

Listing 3.02A since he is 63 inches tall and registered FEV$_1$ of 1.07 on a PFA performed on December 6, 1999. *Id.*

As noted in *Little v. Astrue*, the plaintiff has the burden of proof at steps one through four of the sequential disability benefits analysis, including proving presumptive disability by meeting or exceeding a Medical Listing at step three. 2008 WL 3849937, at *4 (E.D. Ky. Aug. 15, 2008) (quoting *Her*, 203 F.3d at 391). Thus, the plaintiff has the burden of proof at Step Three to demonstrate that "he has or equals an impairment" listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Little*, 2008 WL 3849937, at *4 (quoting *Arnold v. Comm'r of Soc. Sec.*, 238 F.2d 419, 2000 WL 1909386, at *2 (6th Cir. Dec. 27, 2000)). The plaintiff's impairment must meet all of the listing's specified medical criteria and "[a]n impairment that meets only some of the criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530-532, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). At Step Three,

> [i]f the claimant is *not performing substantial gainful work* and has a severe impairment (or impairments) that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment (or impairments) meets or medically equals a listed impairment contained in Appendix 1, Subpart P, Regulation No. 4, the claimant is disabled without further inquiry.

*Little*, 2008 WL 3849937, at *1 (emphasis added). If the plaintiff demonstrates that his impairment meets or equals a listed impairment, then the ALJ must find the plaintiff disabled. *Little*, 2008 WL 3849937, at *4 (quoting *Buress v. Sec'y of Health and Human Servs.*, 835 F.2d 139, 140 (6th Cir. 1987)).

Listing 3.02A provides that the plaintiff will be found disabled if he has a "[c]hronic obstructive pulmonary disease, due to any cause, with the FEV$_1$[42] equal to or less than the values

---

[42] *See* n.4 *supra* for an explanation of FEV$_1$.

specified in Table I corresponding to the person's height without shoes." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.02A. The plaintiff's December 6, 1999, PFA lists his height as 63 inches (tr. 407), and Table I of Listing 3.02A indicates that a person with a height between 61 and 63 inches must have an $FEV_1$ of 1.15 or less to meet the Listing. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.02A. Although the plaintiff's December 6, 1999, PFA indicates that he registered an $FEV_1$ of 1.07, and thus would meet the Listing, the plaintiff was still engaged in substantial gainful activity[43] at the time of this PFA. (Tr. 112, 114, 116, 118.) The regulations clearly provide that a person who is engaged in substantial gainful activity will not be found disabled "regardless of [his] medical condition or [his] age, education, and work experience." 20 C.F.R. §§ 404.1520(b), 416.920(b). Since the plaintiff was still engaged in substantial gainful activity when he registered a qualifying $FEV_1$ score, that score is considered invalid for the purposes of meeting Listing 3.02A. The plaintiff had a second $FEV_1$ score of 1.65, from a Spirometric test on August 15, 2002, after his alleged onset date, but this score does not meet the Table I requirement. Given that the plaintiff does not have a

---

[43] The Regulations define substantial gainful activity as

(a) Substantial work activity. Substantial work activity is work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before.

(b) Gainful work activity. Gainful work activity is work activity that you do for pay or profit. Work activity is gainful if it is the kind of work usually done for pay or profit, whether or not a profit is realized.

20 C.F.R. § 404.1572(a)-(b). The Regulations also take into account the earnings that a plaintiff derives from their work activity and it "provide[s] a table of earnings needed to be earned to constitute substantial gainful activity." *Rineholt v. Astrue*, F. Supp.2d 733, 746-47 (E.D. Tenn. 2009) (citing 20 C.F.R. § 404.1574(b)). The plaintiff earned $13,185.02 in 1999. (Tr. 112.)

23

qualifying FEV₁ score, after he was no longer engaged in substantial gainful activity, he does not

fulfill the requirements of Listing 3.02A.

### 2. The ALJ did not err in finding that Plaintiff was not disabled pursuant to Rule 201.17.

The plaintiff contends that the ALJ erred in failing to find the plaintiff disabled pursuant to

Rule 201.17. Docket Entry No. 12, at 3.  Rule 201.17 provides that a younger individual between

the ages of 45-49, who is illiterate or unable to communicate in English, and previously performed

unskilled work should be classified as disabled if his RFC restricts him to sedentary work as a result

of his impairments. 20 C.F.R. Pt. 404, Subpt. P, App. 2 at Table No. 1.  Evidence in the record

shows that the plaintiff is unable to communicate in English. (Tr. 536-38, 547.)  However, the

plaintiff did not turn 45 until July 1, 2005, nearly four years after his alleged onset date.[44] (Tr. 108,

143.)  Thus, Rule 201.17 is only applicable to the plaintiff beginning July 1, 2005.

The plaintiff supports his argument that he should be found disabled under Rule 201.17 by

pairing the ALJ's findings in her first decision with the VEs' testimony from the first and second

hearings. Docket Entry No. 12, at 3.  The plaintiff points out that the ALJ, in her first decision, gave

controlling weight to Dr. Alkayyali's August 6, 2003, Medical Source Statement (tr. 54, 422-24),

that VE Williams, at the first hearing, determined that, based on Dr. Alkayyali's August 6, 2003,

Medical Source Statement, the plaintiff would be precluded from performing any work (tr. 500), and

---

[44] Since the plaintiff did not turn 45 years old until July 1, 2005,  Rule 201.17 is largely inapplicable to the plaintiff for the majority of his alleged period of disability.  As the Commissioner correctly notes, Rule 201.23 should be applied to the plaintiff since he falls within its 18-44 year old age requirement and it would direct a finding of not disabled. 20 C.F.R. Pt. 404, Subpt. P, App. 2 at Table No. 1.

that VE Ditmore, at the second hearing, concluded that, based on Dr. Alkayyali's August 6, 2003, Medical Source Statement, the plaintiff would be able to perform a less than full range of sedentary work. (Tr. 578.) The plaintiff contends that he clearly meets the requirements of Rule 201.17 since the ALJ assigned controlling weight to Dr. Alkayyali's August 6, 2003, Medical Source Statement and both VEs concluded that Dr. Alkayyali's August 6, 2003, Medical Source Statement would allow the plaintiff to perform, at most, less than a full range of sedentary work. However, the Appeals Council remanded the case to the ALJ after her first decision for further clarification of the RFC that she assigned to the plaintiff and the weight that she afforded to Dr. Alkayyali's and Dr. Davis's assessments. (Tr. 63.)

On remand, the ALJ's second decision addressed the Appeals Council's concerns and she assigned controlling weight to Dr. Davis's consultative examination, did not assign "great weight" to Dr. Alkayyali's August 6, 2003, Medical Source Statement (tr. 19-20, 22), and determined that the plaintiff had an RFC that allowed him to perform light work. (Tr. 22.) The ALJ also complied with 20 C.F.R. §§ 404.1527(d)(3)-(4) and 416.927(d)(3)-(4) when explaining the difference in weight that she assigned to Dr. Davis's and Dr. Alkayyali's assessments. She explained that

> [t]he treatment notes and other medical evidence failed to document the presence of any ongoing musculoskeletal or other impairments that would impose such severe limitations as outlined by Dr. Alkayyali in [his August 6, 2003, Medical Source Statement]. Thus, pursuant to 20 CFR 404.1526(d)(3) and (4) and 416.927(d)(3) and (4), the opinion is not being given the great weight generally accorded to opinions from treating physicians; with the consultative examining physician's opinion being more consistent with the overall evidence of record.

(Tr. 20.)

On December 12, 2007, the Appeals Council denied the plaintiff's request for review of the ALJ's second decision (tr. 5-7), and that decision became the final decision of the Commissioner

and supplanted the findings in the ALJ's first decision. *See Stiltner v. Comm'r of Soc. Sec.*, No. 06-6207, 2007 WL 2264414, at *1 (6th Cir. Aug. 7, 2007) (noting that decision became final decision of Commissioner when Appeals Council denied plaintiff's second request for review after ALJ had twice heard and denied plaintiff's claims). Thus, since the ALJ did not give controlling weight to Dr. Alkayyali's August 6, 2003, Medical Source Statement and followed the Regulations in determining that the plaintiff could perform a light level of work, the ALJ properly found that the plaintiff is not disabled under Rule 201.17.

## V. RECOMMENDATION

For the above stated reasons, it is recommended that the plaintiff's motion for judgment on the administrative record (Docket Entry No. 11) be DENIED and that the Commissioner's decision be AFFIRMED.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this Report and Recommendation and must state with particularity the specific portions of the Report and Recommendation to which objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's Order regarding the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*. 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

JULIET GRIFFIN
United States Magistrate Judge

26